# United States Court of Appeals for the Federal Circuit

---

**CALL HENRY, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2016-1732

---

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00989-LAS, Senior Judge Loren A. Smith.

---

Decided: April 28, 2017

---

BRIAN KOJI, Allen, Norton & Blue, PA, Tampa, FL, argued for plaintiff-appellant.

ROBERT NORWAY, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., STEVEN J. GILLINGHAM; JAMES T. MAHONEY, Office of Chief Counsel, National Aeronautics and Space Administration, Washington, DC; MACALLISTER A. WEST, Cleveland, OH.

STEVEN MICHAEL MASIELLO, Dentons US LLP, Denver, CO, for amicus curiae Professional Services Council. Also represented by THOMAS ANTOINE LEMMER, JOSEPH G. MARTINEZ, III.

––––––––––––

Before REYNA, HUGHES, and STOLL, *Circuit Judges.*

REYNA, *Circuit Judge.*

Call Henry, Inc., appeals from a Court of Federal Claims ("COFC") decision dismissing its breach of contract claim against the United States government. The COFC correctly determined that Call Henry failed to state a claim for which relief could be granted, because the government has no contractual obligation to reimburse Call Henry's pension withdrawal liability costs that were incurred pursuant to the Multi-Employer Pension Plan Amendment Act of 1980, 29 U.S.C. § 1381, *et seq.* We therefore affirm.

## BACKGROUND

On April 23, 2003, Call Henry entered into a contract with the National Aeronautics and Space Administration ("NASA") to provide inspection, maintenance, and testing services. This was a multi-year, fixed-price contract with a base performance period of three years and up to seven one-year option periods. Call Henry's contract was subject to the McNamara-O'Hara Service Contract Act of 1965 ("SCA"), 41 U.S.C. § 6701, *et seq.*, and its implementing regulations.

### A. The Service Contract Act

As relevant here, the SCA requires that a service contract include provisions specifying the contract's "wage determination," which sets the wage rates and fringe benefits that must be paid to various classes of covered service employees. Covered service employees are entitled to a wage determination providing wages and fringe

benefits equal to or greater than: (1) the minimum wage provided pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206; (2) the prevailing rates provided in the locality where the services are performed, as determined by the Department of Labor ("DOL"); or (3) the rates contained in the predecessor contract's collective bargaining agreement. 41 U.S.C. §§ 6703, 6704; 48 C.F.R. §§ 22.1002-2, 22.1002-3; *see also Lear Siegler Servs., Inc. v. Rumsfeld*, 457 F.3d 1262, 1266−67 (Fed. Cir. 2006).

Among other things, the SCA insures that service employees who were protected by a collective bargaining agreement with one contractor are not deprived of the wages and benefits negotiated in that collective bargaining agreement when the contract they work on is competitively awarded to a new contractor. Otherwise, if an incumbent contractor agreed to a collective bargaining agreement that provided for wages and benefits greater than the prevailing wage rate, a challenger could underbid the incumbent for the follow-on contract by providing its employees with lower wages and less valuable benefits. By requiring a successor contractor to provide wages and fringe benefits of equal or greater value than the predecessor contractor, the government protects covered service employees from losing the protection of their collective bargaining agreements. The government also protects itself from successor contractors who might introduce performance risk in the form of underpaid or low-quality labor.

These requirements are reflected in Federal Acquisition Regulation ("FAR") clause 52.222-41 entitled Service Contract Labor Standards, which is incorporated by reference into Call Henry's NASA contract:

> 52.222-41, Service Contract Act of 1965, as Amended (May 1989).
>
> (c) *Compensation*.

(1) Each service employee employed in the performance of this contract by the Contractor or any subcontractor shall be paid not less than the minimum monetary wages and shall be furnished fringe benefits in accordance with the wages and fringe benefits determined by the Secretary of Labor, or authorized representative, as specified in any wage determination attached to this contract.

. . . .

(f) *Successor contracts.* If this contract succeeds a contract subject to the Act under which substantially the same services were furnished in the same locality and service employees were paid wages and fringe benefits provided for in a collective bargaining agreement, in the absence of the minimum wage attachment for this contract setting forth such collectively bargained wage rates and fringe benefits, neither the Contractor nor any subcontractor under this contract shall pay any service employee performing any of the contract work (regardless of whether or not such employee was employed under the predecessor contract), less than the wages and fringe benefits provided for in such collective bargaining agreement, to which such employee would have been entitled if employed under the predecessor contract, including accrued wages and fringe benefits and any prospective increases in wages and fringe benefits provided for under such agreement. . . .

B. The Service Contract Act Price Adjustment Clause

One of the principal policy implications of the SCA is that the U.S. government, as a customer, is willing to pay a premium for services in return for its contractor's obligation to compensate service employees adequately and

fairly. Accordingly, the government is willing to increase contract price when contractors incur increased costs as a result of complying with an increase in the wage determination applicable to their contract. In effect, the contractor is entitled to a price adjustment to reflect increased labor costs associated with complying with an increase in the FLSA minimum wage rate, DOL prevailing wage rate, or the predecessor contract's collective bargaining agreement. The mechanism for providing that price increase is the SCA Price Adjustment Clause.

For multi-year and option contracts, such as the one at issue in this case, the applicable SCA Price Adjustment Clause is FAR 52.222-43.[1] Paragraph (d) of that clause

---

[1] Although not outcome determinative in this case, there is some confusion regarding which FAR price adjustment provisions and contract clauses apply to this dispute. Because this contract was entered into on April 23, 2003, the contract is governed by the FAR provisions and clauses that were in effect on that date. Accordingly, Call Henry's NASA contract is governed by the clauses and provisions in effect as of April 23, 2003. 48 C.F.R. §§ 1.108(d); *BearingPoint, Inc. v. United States*, 77 Fed. Cl. 189, 193–94 (2007).

Pursuant to the *Christian* doctrine, the mandatory SCA clauses applicable to this contract are incorporated by reference, as those clauses reflect congressionally enacted, deeply ingrained procurement policy. *G.L. Christian & Assocs. v. United States*, 312 F.2d 418, 426 (Ct. Cl. 1963); *General Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 779–780 (Fed. Cir. 1993); JOHN CIBINIC, JR., JAMES F. NAGLE & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 23–24 (5th ed. 2016).

Accordingly, even though Call Henry's contract with NASA incorporates only FAR 52.222-44, which applies to single-year contracts, this contract dispute is nevertheless

provides a framework for increasing the unit labor rates in a service contract when certain events occur that increase the costs of complying with an increased wage determination. Paragraph (d) acknowledges cost increases due to an increase in the FLSA minimum wage or DOL prevailing wage rate. It also recognizes cost increases that occur by operation of law, such as when a successor contract is bound by the wages and benefits provided in a predecessor contractor's collective bargaining agreement:

> 52.222-43 Fair Labor Standards Act and Service Contract Act—Price Adjustment (Multiple Year and Option Contracts) (May 1989).
>
> (d) The contract price or contract unit price labor rates will be adjusted to reflect the Contractor's actual increase or decrease in applicable wages and fringe benefits to the extent that the increase is made to comply with or the decrease is voluntarily made by the Contractor as a result of:
>
> > (1) The Department of Labor wage determination applicable on the anniversary date of the multiple year contract, or at the beginning of the renewal option period . . . ;
> >
> > (2) An increased or decreased wage determination otherwise applied to the contract by operation of law; or

---

governed by FAR 52.222-43, which applies to multi-year and option contracts.

(3) An amendment to the Fair Labor Standards Act of 1938 that is enacted after award of this contract, affects the minimum wage, and becomes applicable to this contract under law.

## C. Call Henry's Successor Contracts, Collective Bargaining Agreements, Pension Withdrawal, and MPPAA Withdrawal Liability

The three-year base performance period of Call Henry's contract with NASA was a successor contract. By operation of law, the wage determination applicable to the base performance period was provided by the predecessor contractor's collective bargaining agreement. Under the predecessor contract, Call Henry's service employees were members of the International Brotherhood of Teamsters Local Union No. 416 ("the Teamsters"). Instead of providing wages and benefits through an alternative arrangement, Call Henry chose to negotiate a collective bargaining agreement with the Teamsters. The first such agreement was effective from 2003 to 2007 ("2003–2007 Teamsters Agreement"), and it required Call Henry to join and contribute to the Teamsters' Pension Plan.

The Teamsters' Pension Plan is a multi-employer pension plan, which is subject to the Multi-Employer Pension Plan Amendment Act ("MPPAA"). Among other things, the MPPAA protects employees receiving benefits under a multi-employer pension plan by requiring any employer who withdraws from the plan to pay withdrawal liability to the pension fund. This withdrawal liability is paid by the withdrawing employer in order "to fund its share of the [pension] plan obligations incurred during its association with the plan." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225 (1986); 29 U.S.C. § 1381(b)(1) ("The withdrawal liability of an employer to a plan is the amount determined . . . to be the allocable amount of unfunded vested benefits, . . .").

In 2007, NASA executed the first option period. That option contract was a successor contract to the three-year base performance period. *See* 29 C.F.R. § 4.143(b); *see also Lear*, 457 F.3d at 1267. Therefore, by operation of law, the 2003–2007 Teamsters Agreement provided the wage determination applicable to the first option period.

It is critical to distinguish between: (1) Call Henry's obligations to its service employees pursuant to the 2003–2007 Teamsters Agreement, (2) Call Henry's contractual obligations to NASA, and (3) Call Henry's statutory obligations under the MPPAA to the Teamsters' Pension Plan. Call Henry was bound by the 2003–2007 Teamsters Agreement as soon as that agreement was implemented in 2003, but that collective bargaining agreement did not serve as the wage determination applicable to Call Henry's contract with NASA until NASA executed the first option period in 2007. Only then was Call Henry contractually bound to NASA by FAR 52.222-41(f) to provide its service employees with wages and benefits equal to or greater than those provided in the 2003–2007 Teamsters Agreement. Similarly, as soon as Call Henry enrolled in the Teamsters' Pension Plan, it was subject to the MPPAA and potential withdrawal liability, but that statutory obligation existed independently from Call Henry's obligations under the 2003–2007 Teamsters Agreement and the NASA contract.

NASA continued to exercise option contracts, and Call Henry continued to enter into new collective bargaining agreements with the Teamsters. Each time a new collective bargaining agreement went into effect, it provided the wage determination that would apply by operation of law to the next option period executed by NASA. As Call Henry negotiated new collective bargaining agreements, its mandatory pension contributions were increased. Each time a collective bargaining agreement with increased pension contributions served as the wage determination for a new option contract, NASA provided a

price adjustment pursuant to the SCA Price Adjustment Clause reflecting the increased cost of providing service employee pension benefits.

The increases to Call Henry's pension contributions were due to the fact that, in 2008, the Teamsters' Pension Plan reached "critical status," as defined by the Pension Protection Act of 2006.[2] The same statute required the board of trustees of the Teamsters' Pension Plan to adopt a rehabilitation plan scaling back certain employee benefits and mandating increased employer contributions. 26 U.S.C. § 432(e).

In 2012, the International Association of Machinists and Aerospace Workers petitioned the National Labor Relations Board ("NLRB") to decertify the Teamsters as the representative for Call Henry's service employees. Subsequently, Call Henry's employees voted to associate with a new union. As a result, on May 7, 2012, the NLRB decertified the Teamsters as the representative for Call Henry's employees.

Based on the NLRB decertification order, Call Henry was deemed to have withdrawn from the Teamster's Pension Plan pursuant to the MPPAA and Title IV of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1301, *et seq*. As a result, Call Henry was potentially liable to pay approximately six million dollars of MPPAA withdrawal liability to the Teamsters' Pension Plan. 29 U.S.C. § 1381(a). Call Henry disputed its withdrawal liability determination in arbitration, and the liability was reduced to less than two million dollars.

---

[2] The Pension Protection Act describes four different scenarios that constitute "critical status," each of which generally relates to deficient funding or liquidity. *See* 26 U.S.C. § 432(b)(2). It is not clear from the record why the Teamster's Pension Plan reached critical status.

### D. Proceedings Below

On June 27, 2014, following the arbitration decision, Call Henry submitted a certified claim to NASA seeking reimbursement for the assessed MPPAA withdrawal liability. The only legal authority Call Henry identified in its claim was the SCA Price Adjustment Clause. Call Henry characterized withdrawal liability as an increased cost of providing pension benefits pursuant to its collective bargaining agreements with the Teamsters.

NASA denied the claim on September 11, 2014. The Contracting Officer explained that MPPAA withdrawal liability is not an increased cost of complying with the collective bargaining agreements, but a result of withdrawal from the pension fund. The Contracting Officer also analogized the withdrawal liability to a retroactive wage determination, which is not contemplated as a basis for adjustment in the SCA Price Adjustment Clause.

On October 15, 2014, Call Henry filed a single-count complaint at the COFC, alleging that the United States breached its contract with Call Henry by refusing to provide an upward adjustment in contract price to offset Call Henry's increased pension benefit costs. The government moved to dismiss for failure to state a claim on the grounds that the government has no contractual duty to provide a price adjustment covering Call Henry's MPPAA liability.

The COFC granted the government's motion to dismiss based on two independent lines of reasoning. First, the COFC reasoned that Call Henry's contract only incorporates the "economic provisions" of the Teamsters Agreement relevant to the SCA, such as the wages and value of fringe benefits to be provided. Therefore, according to the COFC, Call Henry's NASA contract does not require Call Henry to join the Teamsters' Pension Plan.

Second, the COFC held that MPPAA withdrawal liability is not a "fringe benefit" covered by the SCA, and therefore not a cost covered by the SCA Price Adjustment Clause. The COFC's analysis turned on the premise that the SCA limits its coverage to "fringe benefits not otherwise required by Federal, State, or local law." 41 U.S.C. § 6703. Based on that reading of the SCA, the COFC reasoned that withdrawal liability is not a "fringe benefit," because it is specifically provided for by a federal statute other than the SCA—*i.e.*, the MPPAA. Having explained that MPPAA withdrawal liability is not a fringe benefit covered by the SCA, the COFC concluded that MPPAA withdrawal liability is not a cost covered by the SCA Price Adjustment Clause. *See Call Henry, Inc. v. United States*, 125 Fed. Cl. 282, 285–86 (2016).

Call Henry appeals. This Court has jurisdiction over appeals from final decisions of the COFC. 28 U.S.C. § 1295(a)(3).

## STANDARD OF REVIEW

This court reviews the grant of a motion to dismiss *de novo*. *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014). "To survive a motion to dismiss, a complaint must contain sufficient factual allegations that, if true, would state a claim to relief that is plausible on its face. *Id*. The court must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant. *Id*. However, we interpret statutes, contracts, and regulations *de novo*. *See id*.; *Lear*, 457 F.3d at 1266.

"A breach of contract claim requires two components: (1) an obligation or duty arising out of the contract and (2) factual allegations sufficient to support the conclusion that there has been a breach of the identified contractual duty." *Bell/Heery*, 739 F.3d at 1330. In this appeal, the only question is whether Call Henry's NASA contract obligates NASA to adjust the contract price to account for

Call Henry's MPPAA withdrawal liability. We review the COFC's decision on that issue *de novo*, because it is a question of law that requires interpretation of contract terms, regulations, and statutory provisions.

## DISCUSSION

Call Henry, with support of *amicus curaie* Professional Services Council ("PSC"), presents two primary theories to establish entitlement to a price adjustment. First, Call Henry argues that, contrary to the COFC's conclusion, MPPAA withdrawal liability is a fringe benefit because MPPAA liability represents the lump-sum value of pension benefits that have already accrued to Call Henry's employees.

Second, assuming MPPAA withdrawal liability is a fringe benefit, Call Henry argues that it is entitled to a price adjustment equal to the amount of its MPPAA withdrawal liability pursuant to the SCA Price Adjustment Clause, FAR 52.222-43(d). According to Call Henry, MPPAA withdrawal liability is an increased cost made to comply with its contractual obligation to continue to provide its service employees the pension benefits provided in the agreements with the Teamsters. To support this proposition, Call Henry relies on our decision in *Lear*, 457 F.3d at 1265.

In *Lear*, the collective bargaining agreement that applied by operation of law to Lear's successor contract provided for a defined benefit health plan, where employees were guaranteed certain benefits and employer contributions were variable. Therefore, Lear's contract with the Air Force required Lear to provide its covered service employees with defined health benefits of equal or greater value than those provided in the predecessor contract's collective bargaining agreement. After Lear's successor contract was priced, actuarial analysis revealed that the cost of Lear's health plan contributions would have to

increase in order to provide its employees with their defined health benefits.

Lear sought a price adjustment pursuant to FAR 52.222-43(d) to account for its increased health plan contribution costs. The Air Force denied Lear's claim, and the Armed Services Board of Contract Appeals affirmed, reasoning that the SCA Price Adjustment Clause only provides for adjustment when the value of the employees' benefits change, not where a contractor's costs of providing those benefits change. This court reversed, holding that "the Price Adjustment Clause is triggered by changes in an employer's cost of compliance with the terms of a wage determination. The fact that there has been no nominal change in the mandated benefit—i.e., that there has been no change in the level of benefit provided by the defined-benefit plan—is simply irrelevant." *Id.* at 1268−69 (emphasis omitted).

Call Henry and *amicus curiae* PSC devote considerable attention to the issue of whether MPPAA withdrawal liability is a "fringe benefit" covered by the SCA. But that is not the dispositive question presented in this case. Even if we held that MPPAA withdrawal liability may, in some cases, be a cost of providing fringe benefits covered by the SCA, Call Henry's breach of contract claim would still fail.

As relevant here, the SCA Price Adjustment Clause in Call Henry's NASA contract conditions an upward price adjustment on increased costs made to comply with a "wage determination otherwise applied to the contract." FAR 52.222-43(d)(2). Call Henry's MPPAA withdrawal liability is a not an increased cost of complying with a wage determination applied to Call Henry's NASA contract. Therefore, it is not an increased cost covered by the SCA Price Adjustment Clause.

This case is distinguishable from *Lear*. Lear was contractually bound to the Air Force to make the contribu-

tions necessary to provide its employees with certain defined benefits. When the cost of those contributions increased, that constituted an increased wage determination applied by operation of law to Lear's contract with the Air Force. In contrast, Call Henry's contract with NASA did not obligate Call Henry to pay MPPAA liability in the event of withdrawal. Instead, FAR 52.222-41(f) required Call Henry to provide its service employees with wages and fringe benefits equal or greater in value to those provided in the collective bargaining agreement applicable to the predecessor contract.

When Call Henry independently chose to provide its employees with benefits by negotiating a collective bargaining agreement with the Teamsters and joining the Teamsters' multiemployer pension plan, Call Henry independently assumed the risk of MPPAA withdrawal liability. Under these circumstances, where NASA did not require Call Henry to negotiate with the Teamsters or join the Teamsters' Pension Plan, and where NASA has no contractual recourse if Call Henry fails to satisfy its MPPAA withdrawal liability obligations, we do not read the SCA Price Adjustment Clause to allocate the risk of MPPAA liability to the government. Accordingly, the COFC correctly dismissed Call Henry's complaint for failure to state a claim. We affirm.

## AFFIRMED

### COSTS

Each party to bear its own costs.