DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| BAE Systems Technology Solutions & | ) ASBCA Nos. 63218, 63219 |
| Services Inc. | ) |
| | ) |
| Under Contract No. FA2517-06-C-8001 | ) |

APPEARANCES FOR THE APPELLANT: Suzanne Sumner, Esq.
  Taft Stettinius & Hollister LLP
  Dayton, OH

  Barbara A. Duncombe, Esq.
  Taft Stettinius & Hollister LLP
  Indianapolis, IN

APPEARANCES FOR THE GOVERNMENT: Caryl A. Potter, III, Esq.
  Air Force Deputy Chief Trial Attorney
  Le'Dara Clark, Esq.
  Aaron J. Weaver, Esq.
  Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE EYESTER
PURSUANT TO BOARD RULE 11

BAE Systems Technology Solutions & Services Inc. (BAE) appeals a contracting officer's final decision (COFD) denying its claim, and a pass-through claim by BAE's subcontractor Aleut O&M Services (Aleut). Both argue the Department of the Air Force (Air Force or government) breached the contract when it failed to reimburse BAE and Aleut incurred pension withdrawal liability costs.

The parties elected to waive a hearing and submit the appeals on the record pursuant to Board Rule 11. Based on the following, we conclude that the Air Force did not breach the contract.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

FINDINGS OF FACT (FOF)

1.  On May 22, 2006, the Air Force awarded BAE[1] Contract No. FA2517-06-C-8001, known as the Solid State Phased Array Radar System (SSPARS) contract (R4, tab 2 at 2, 247).  The contract supported the SSPARS program, which is comprised of five radar sites at various locations in the northern hemisphere.  BAE was to provide all necessary personnel, and administrative, financial and managerial services to meet the mission requirements at these sites.  The one site relevant here was Clear Air Force Station (AFS) in Alaska.  (R4, tab 2a at 3)  The predecessor SSPARS contractor was ARCTEC Services (ARCTEC), which means that BAE was the successor contractor (gov't br. at 1; app. br. at 2).  According to BAE, once awarded the contract, it hired the incumbent workforce (app. br. at 1).

2.  The contract included fixed-priced and fixed-priced incentive contract line item numbers (CLINs) for services and cost reimbursable CLINs for supplies, training, travel, meals, and severable work.  The period of performance included a phase-in period beginning July 1, 2006, a one-year base period ending September 30, 2007, 11 one-year option periods ending August 31, 2018, and a phase-out period.  (R4, tabs 2 at 5-246, 251; 67 at 1)  According to the phase-out CLIN, the government was to notify BAE it required the services, BAE was to provide a fully supported proposal, and the contracting officer would then negotiate the price (R4, tab 2 at 4).  The phase-out CLIN described the services as "[l]abor, supplies, materials, travel and other items or services necessary to transition contract responsibilities" (*id.* at 246).  The PWS further explained that the phase-out required BAE ensure continuous service and complete necessary activities to transition the contract and allow the successor contractor access to systems (R4, tab 2a at 108).

3.  The contract was subject to the Service Contract Act (SCA)[2] and thus it incorporated by reference several Federal Acquisition Regulation (FAR) SCA clauses, and others, as follows:  52.215-15, PENSION ADJUSTMENTS AND ASSET REVERSIONS (OCT 2004); 52.222-41, SERVICE CONTRACT ACT OF 1965, AS AMENDED (MAY 1989); 52.222-43, FAIR LABOR STANDARDS ACT AND SERVICE CONTRACT ACT – PRICE ADJUSTMENT (MULTIPLE YEAR AND

---

[1] The contract was originally awarded to BAE Systems Technical Services, Inc. (R4, tab 2 at 2).  When the name of the entity changed, the Air Force modified the contract to recognize BAE as the successor in interest (R4, tab 69 at 1, 3).

[2] The FAR clauses here reference the Service Contract Act of 1965.  However, that statute has been renamed and re-codified as Service Contract Labor Standards, 41 U.S.C. chapter 67.  Pub. L. 111-350, sec. 3, Jan. 4, 2011, 124 Stat. 3811; FAR 1.110, Positive Law Codification.  To maintain consistency with the FAR clauses incorporated into the contract here, we refer to the statute as the SCA or Service Contract Act.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

OPTION) (MAY 1989); 52.222-47, SERVICE CONTRACT ACT (SCA) MINIMUM WAGES AND FRINGE BENEFITS (MAY 1989);[3] and 52.237-3, CONTINUITY OF SERVICES (JAN 1991) (R4, tab 2 at 263-65).

4. Both parties state that BAE notified the contracting officer of applicable collective bargaining agreements (CBAs) pursuant to FAR 52.222-41(m) (app. br. at 2-3; gov't br. at 3). As a result, the contract incorporated and included as an attachment the following DOL wage determinations for the International Brotherhood of Teamsters (IBT CBA) and Fairbanks Joint Craft Council (FJCC CBA) as follows:

| Type | Location | Wage Determination (WD) Number | Date | Pages |
|---|---|---|---|---|
| CBA | Clear AFS | 2005-3262 (Rev 0) | 09/27/05 | 73 (page count includes WD, International Brotherhood of Teamsters (IBT) Local 959 CBA and Addendum) |
| CBA | Clear AFS | 2005-3263 (Rev 0) | 09/27/05 | 50 (page count includes WD and Fairbanks Joint Crafts Council (FJCC) CBA) |

(R4, tab 2 at 247, 279). The contract also incorporated by reference the FJCC and IBT CBA Schedule 1A for Clear AFS (*id.* at 279).[4] Further, the contract explained the following for the IBT CBA effective October 1, 2005 through September 30, 2010, and the FJCC CBA effective October 1, 2005 through September 30, 2009:

> In accordance with Section 2(a)[5] and 4(c)[6] of the Service
> Contract Act, as amended, employees employed by the
> contractor(s) in performing services covered by the
> Collective Bargaining Agreement(s) are to be paid wage
> rates and fringe benefits set forth in the current collective

---

[3] This clause was removed from the FAR in 2007 because the Department of Labor (DOL) created an online wage determination process. 72 Fed. Reg. 13585 (March 22, 2007).

[4] The FJCC CBA included a schedule showing the hourly wage, health and welfare, pension, training, and other amounts to be paid; the IBT CBA schedule was not included in the record (R4, tab 65b at 48).

[5] Section 2(a) of the SCA set forth the requirement for contracts to include minimum wages and fringe benefits. Pub. L. No. 89-286, sec. 2(a), Oct. 22, 1965, 79 Stat. 1034.

[6] Section 4(c) of the SCA set forth the requirement for successor contracts. Pub. L. No. 92-473, sec. 3(b), Oct. 9, 1972, 86 Stat. 789.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

bargaining agreement and modified extension
agreement(s).

(R4, tab 2b at 1-2). We find that DOL adopted these CBAs as the wage
determinations applicable to the base period of the contract (for this locality and
covered employees).

5. These CBAs were originally between the predecessor contractor ARCTEC
and the unions and, in fact, the original agreements referenced in the contract still refer
to ARCTEC as the contractor (R4, tab 2b at 1-2; gov't br. at 3). Regardless, as BAE
explains, it operated under these agreements until 2009 and 2010 (app. br. at 3). We
find therefore that BAE adopted all of the terms and conditions of these CBAs.

6. The CBAs set forth the health and welfare benefits provided to SCA-covered
employees, including pension benefits (R4, tab 2b at 1-2). According to the IBT CBA,
the contractor participated in the Alaska Teamster-Employer pension plan and for the
FJCC CBA in the Locals 302 & 612 of the International Union of Operating
Engineers-Employers Construction Industry Pension Plan and the National Retirement
Fund[7] (R4, tabs 65a at 22; 65 at 2). We refer to these collectively as the pension plans.
Both parties agree that these pension plans are multi-employer pension plans (gov't br.
at 3; app. br. at 5). As such, the plans are subject to the Multi-Employer Pension Plan
Amendment Act, 29 U.S.C. § 1381 *et seq.* (MPPAA).

7. The IBT CBA stated the following with respect to pensions:

**6.02 Alaska Teamster-Employer Pension Trust.**

The Company agrees to participate as an individual
Employer in the Alaska Teamster-Employer Pension Plan
for the employees covered by this Agreement. . . . The
Employer and the Union agree to be bound by the Trust
Agreement and all of the lawful amendments to it. . . .

a. The Company will contribute to the Alaska
Teamster-Employer Pension Trust in accordance with the
Schedule 1's, which are attached to this Agreement, for the
purpose of providing retirement benefits for employees. It
is understood that the contributions are to be computed
solely on the total number of compensable hours, and are
not to be included in hourly wages or the computation of
overtime. The Union warrants and represents that the

---

[7] According to BAE, this fund is now known as UNITE-HERE (R4, tab 65 at 2 n.8).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

> Company's liability, with respect to providing retirement benefits, shall be no greater than provided above, including the Trust Agreement and applicable law. Furthermore, the Trust funds will remain a jointly-established Trust Fund, administered, operated, and maintained in accordance with the law, and further that the Trust Fund is, and will continue to be, qualified by the Internal Revenue Service.

(R4, tab 65a at 22). The FJCC CBA stated the following:

> **15.01 PENSION PLAN.**
>
> With respect to employees covered by the Agreement, the Company will contribute to the applicable Trust Fund according to the appropriate schedules which are attached to this Agreement, for the purpose of providing retirement benefits for employees. It is understood and agreed that the contributions are to be computed solely on the total number of compensable hours and are not to be included in hourly wage rates or the computation of overtime.
>
> The Union warrants and represents that the Company's liability, with respect to providing retirement benefits, shall be no greater than as provided above, that the respective Trust Funds are jointly established Trust Funds administered, operated, and maintained in accordance with the law, and further that the Trust Funds have been and continue to be qualified by the Internal Revenue Service.

(R4, tab 65b at 34). The agreement automatically renewed unless the parties notified the other of changes desired or termination requested (*id.* at 43).

8. On June 29, 2006, BAE issued a fixed-priced incentive plus award fee subcontract to Aleut, with the same period of performance as BAE's contract, to perform some of the SSPARS services (R4, tab 65l at 18-19, 21, 28).[8] Aleut's subcontract also incorporated by reference the same FAR SCA clauses and the CBAs from BAE's prime contract (*id.* at 55, 71).

9. In October 2010, the Alaska Teamster-Employer Pension Trust notified contributing employers and others that it adopted a Rehabilitation Plan because the

---

[8] The subcontract was originally awarded to Aleut Global Solutions, LLC (R4, tab 65l at 18). BAE assigned the subcontract to Aleut on February 12, 2013 (*id.* at 74).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

plan dropped below the required 80 percent funding ratio due to a downward slide in the financial markets (R4, tab 14 at 5-17).  The Rehabilitation Plan consisted of two parts:  an increase in the retirement age and a supplemental contribution (or surcharge) to be made by contributing employers (*id.* at 6, 12).

10.    The parties do not dispute that BAE submitted several requests for equitable adjustment (REAs) to cover the increased cost of the surcharges for fiscal years (FYs) 14-18 and that the Air Force modified the contract several times to address these REAs and make adjustments.  However, the parties dispute the number of modifications issued and the applicable fiscal years.  (Gov't br. at 4; app. br. at 7) Resolution of that issue is not relevant to our decision.

11.    However, there are several modifications that discuss the CBAs, including "new" CBAs, and price adjustments which are relevant to our analysis.  The record shows the Air Force modified the contract several times to definitize an SCA settlement agreement between both parties or incorporate a CBA price adjustment and apply wage increases required by the CBAs for FYs 07 through 13 (*see e.g.*, R4, tabs 3-8, 20).  In addition, on April 21, 2014, the parties signed a bilateral modification incorporating the SCA/CBA price adjustments for FY 14, which were based on incorporation of DOL wage determinations for CBAs between BAE and FJCC and IBT (R4, tab 40 at 1).  Later, the Air Force modified the contract to include the SCA/CBA price adjustments for FYs 16-18 for the "new" CBAs between BAE and FJC (R4, tab 59 at 1-2).  On May 15, 2017, the Air Force issued a modification incorporating SCA/CBA price adjustments for the fixed-priced incentive line items due to "the incorporation of negotiated CBAs between" BAE and IBT for FY 18, and also included wage adjustments for the FJCC (R4, tab 60 at 1-2).  On June 28, 2017, the Air Force issued a modification incorporating the SCA/CBA price adjustments based on the "incorporation of re-negotiated CBAs" between BAE and IBT and FJCC (and others) (R4, tab 61 at 1-2).  We find that several contract modifications referenced extended or incorporated new CBAs.  BAE explains it executed "follow-on" CBAs with IBT and FJCC (app. br. at 3) but the record does not seem to contain a complete agreement evidencing this.  Further, while these modifications addressed changes in wages or the incentive fees due to the new CBAs, they did not specifically address pension plan withdrawal liability penalties.

12.    There is a partial document in the record showing BAE's participation in the Alaska Teamster-Employer Trust that has a date of October 1, 2016 through September 30, 2019 (R4, tab 65i) and another partial document with FJCC that has a date of October 1, 2015 through September 30, 2019 (R4, tab 65j).  As relevant here, the document dated October 1, 2016 through September 30, 2019 and which the index titled "Clear IBT CBA Sec. 6.02," was modified from the prior CBA and stated that: "The Union warrants and represents that the Company's liability (*excluding withdrawal liability*), with respect to providing retirement benefits, shall be no greater

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

than provided above, including the Trust Agreement and applicable law" (R4, tab 65i) (emphasis added).

13. The Air Force exercised, and BAE performed, the base and all 11 option years. We find that BAE and Aleut continued to use the union pension plans for the base and all option years. In 2017, the Air Force re-competed the contract. Aleut offering as the prime, and BAE as the subcontractor, was unsuccessful. (R4, tab 65 at 1)

14. On May 11, 2018, BAE submitted a phase-out proposal which included an estimated $41 million for pension plan withdrawal liability in connection with the pension funds (R4, tab 65f at 1, 3-4, 7, 16, 18-21). The phase-out proposal assumed the government would exercise FAR 52.217-8, OPTION TO EXTEND SERVICES (*id.* at 3). BAE stated in the proposal that since Aleut and BAE lost the re-compete, they would withdraw from the associated pension plans on August 31, 2018, and the plans would calculate the unfunded vested liability for both companies; BAE explained it included these as non-labor other direct costs since the costs were a direct result of the phase-out and beyond BAE and Aleut's control (*id.* at 4).

15. On June 27, 2018, the Air Force issued a bilateral modification increasing the contract price for phase-out costs from June 1, 2018 through August 31, 2018,` in the amount of $435,076 (R4, tab 63 at 1-2). The modification explained that it did not include the withdrawal liability costs requested and included only "actual phase-out activities themselves" (*id.* at 3). The Air Force considered the matter separately and declined to reimburse BAE for this withdrawal liability because it was not a bona fide fringe benefit and therefore unallowable (R4, tab 65g). The contract ended on August 31, 2018 (gov't br. at 2; *see* app. br. at 7).

16. On September 28, 2021, BAE submitted its certified claim on behalf of itself and as a sponsor for Aleut seeking $20,839,575 for the pension plan withdrawal liability costs incurred for BAE ($15,842,319) and Aleut ($4,997,256) (R4, tab 65 at 1, 16).[9] BAE explained that since it was not performing on the contract, it was no longer required to make prospective, regular monthly contributions to the pension plans and was required to pay a withdrawal liability (*id.* at 3). BAE was still waiting for the amount owed to the Locals 302 & 612 of the International Union of Operating Engineers - Employers Construction Industry Pension Plan (*id.* at 1 n.3).

---

[9] The letter from UNITE-HERE explained that BAE "incurred a complete withdrawal from the Fund as of September 1st, 2018" and was liable for withdrawal liability (R4, tab 65d at 1). The letter from the Alaska Teamster-Employer Pension Plan explained that an employer withdrawing from the pension plan is "generally liable to the Trust for a share of the Plan's unfunded vested benefits" as determined by the MPPAA (R4, tab 65e at 1).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

17.    In the claim, BAE argued, as it does in these appeals, that as pensions are a bona fide fringe benefit pursuant to 29 C.F.R. § 4.162(a), so are pension withdrawal liabilities incurred to comply with the pension benefit set forth in the CBAs (R4, tab 65 at 8).  In addition, BAE argued that since the Air Force reimbursed BAE for monthly contribution payments and surcharges when the pension trusts were underfunded, the Air Force should treat the withdrawal liability the same--as an actual increase in the cost of the fringe benefit to comply with the applicable wage determination pursuant to FAR 52.222-43 (*id.* at 8-10).  BAE further argued that the withdrawal liability is included in the CBAs, which were incorporated into the contract and therefore FAR 52.222-43 allows for this upward price adjustment to cover the cost (*id.* at 10-11).  Second, BAE argued that the Air Force's position was contrary to the SCA and public policy, both of which protect federal service employees and their wages and fringe benefits (*id.* at 12-13).  Third, BAE argued that pension withdrawal liability is a valid phase-out cost pursuant to FAR 52.237-3(d) (*id.* at 13-14).  Last, BAE claimed that the pension withdrawal liability is allowable pursuant to FAR 31.205-7 as a reimbursable payment to cover a previously unquantifiable contingency (*id.* at 14).

18.    Aleut asserted two bases for its claim for reimbursement.  First, Aleut argued that FAR 52.222-43 entitled it to recover the pension withdrawal liability costs because they are an increased cost occurring by operation of law, in this case the CBA (R4, tab 65l at 6-9).  Second, Aleut argued that the withdrawal from the pensions was a segment closing pursuant to FAR 52.215-15, which provides that contractors are entitled to a contract price adjustment reflecting the government's share of an underfunded pension plan in the event of a segment closing, pension plan termination, or curtailment of benefits, and it is therefore entitled to reimbursement (*id.* at 10-11).

19.    The Air Force issued a COFD denying the claim on December 6, 2021.  First, the contracting officer concluded that while monthly pension contribution payments and surcharge cost increases are an allowable fringe benefit cost, MPPAA pension withdrawal liability is not allowable pursuant to 29 C.F.R. § 4.162(a) because it is not an increased cost of complying with a wage determination that applies to the contract (R4, tab 67 at 6).  The contracting officer also concluded the CBAs did not require payment of the pension withdrawal liability costs and relied primarily on the United States Court of Appeals for the Federal Circuit (Federal Circuit) holding in *Call Henry, Inc. v. U.S.*, 855 F.3d 1348 (Fed. Cir. 2017) (referred to as *Call Henry II*) as support for its position that it had no contractual obligation to reimburse these costs (*id.* at 6-8).  In addition, because these costs were not a contractual basis for liability, the contracting officer concluded they were not valid phase-out costs (*id.* at 14).  Finally, the contracting officer concluded these costs were not a contingency cost, but an independent cost assumed by BAE as a business decision (*id.* at 15).  For all these same reasons, the contracting officer denied Aleut's pass-through claim (*id.* at 16).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

20.   On March 4, 2022, BAE timely appealed the decision to the Board, which was docketed as ASBCA No. 63218 (BAE claim) and ASBCA No. 63219 (Aleut) respectively.  Both parties agreed to submission pursuant to Board Rule 11.

DECISION

As with its claim, BAE argues the Air Force breached its contract when it failed to reimburse BAE and Aleut the incurred pension withdrawal liability costs pursuant to FAR 52.222-43 (price adjustments), FAR 52.237-3 (phase-outs), FAR 31.205-7 (unquantifiable contingencies), or FAR 52.215-15 (segment closing costs).  BAE seeks breach of contract damages in the amount of $20,839,575, plus interest, costs and fees as allowable (compl. ¶ 82).  The Air Force disputes all of these arguments on the same bases set forth in the COFD and primarily relies on *Call Henry II* as support (gov't br. at 11-26).

"A breach of contract claim requires two components:  (1) an obligation or duty arising out of the contract and (2) factual allegations sufficient to support the conclusion that there has been a breach of the identified contractual duty." *Call Henry II*, 855 F.3d at 1354 (quoting *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014)).  We address each of BAE's arguments.

   a.  *Did the Air Force breach the contract when it failed to adjust the contract price pursuant to the FAR SCA clauses?*

As background, the SCA's purpose is to provide labor standards for employees of contractors furnishing services to the government and applies to federal contracts with a principal purpose of providing services using service employees.  Pub. L. No. 89-286, 79 Stat. 1034; 41 U.S.C. § 6702(a).  Pursuant to the SCA, these federal contracts must include provisions specifying the minimum wages to be paid and fringe benefits to be provided to the service employees.  41 U.S.C. § 6703(1), (2).  DOL determines these minimum wages and fringe benefits in a wage determination based on either (1) those prevailing in the locality, or (2) as set forth in an applicable CBA which includes "prospective fringe benefit increases provided for in the agreement as a result of arm's-length negotiations." *Id.*; *see also* 29 C.F.R. § 4.50(b).  Pensions are one example of a fringe benefit.  41 U.S.C. § 6703(2).  The FAR implementing regulation, FAR 52.222-41, SERVICE CONTRACT ACT OF 1965, AS AMENDED (MAY 1989), likewise requires service employees be paid no less than the minimum wages and fringe benefits set forth in a wage determination attached to the contract.  FAR 52.222-41(c)(1).

The SCA also addresses successor contracts, *i.e.*, contracts succeeding one subject to the SCA and for substantially the same services as the prior contract.  41 U.S.C § 6707(c)(1).  Successor contractors, such as BAE, "may not pay a service

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

employee less than the wages and fringe benefits the service employee would have received under the predecessor contract, including accrued wages and fringe benefits and any prospective increases in wages and fringe benefits provided for in a" CBA. *Id.* This is true even if no wage determination is attached to the contract. FAR 52.222-41(f). As the FAR explains, this requirement "is self-executing and is not contingent upon incorporating a wage determination or the wage and fringe benefit terms of the predecessor contractor's collective bargaining agreement in the successor contract." FAR 22.1002-3(a); *see also* 29 C.F.R. § 4.163(b). Similarly, FAR 52.222-47, SERVICE CONTRACT ACT (SCA) MINIMUM WAGES AND FRINGE BENEFITS (MAY 1989) explains that pursuant to FAR 52.222-41(g), the "economic terms" of the predecessor CBA apply to the contract, while FAR 52.222-41(g) discusses the "minimum monetary wage and any fringe benefits required to be paid pursuant" to the contract. DOL's regulations further explain that even if a successor contractor has its own CBA, the minimum wages and fringe benefits are those set forth in the predecessor contractor's CBA. 29 C.F.R. § 4.163(d).[10]

The SCA allows for some flexibility. Specifically, it provides that the "obligation" to provide these fringe benefits "may be discharged by furnishing any equivalent combinations of fringe benefits or by making equivalent or differential payments in cash under regulations established by the Secretary." 41 U.S.C. § 6703(2). The FAR instructs the same. *See* FAR 52.222-41(d) (the contractor "may discharge the obligation to furnish fringe benefits" specified in the attached wage determination "by furnishing equivalent combinations of bona fide fringe benefits, or by making equivalent or differential cash payments. . . .").

Consequently, FAR 52.222-41(m) requires contractors notify the contracting officer if wages or fringe benefits will be provided for in a CBA that is or will be effective during any period of performance on the contract. This notification is required at the beginning of the contract if the CBA is effective at that time. FAR 52.222-41(m).

Both the FAR and DOL's regulations also explain that when an existing contract is extended, such as via an option clause, the extension is considered a new contract and requires the insertion of a new or revised wage determination. 29 C.F.R. § 4.143(b); *see also* FAR 22.1007(b). In other words, a contractor may become its own successor contractor when the government exercises an option or otherwise extends the term of the existing contract. 29 C.F.R. § 4.163(e).

---

[10] Requiring the awardee pay locally prevailing wage rates and fringe benefits or the wage rates and fringe benefits set forth in a predecessor contractor's CBA levels the playing field amongst all offerors, including the incumbent, on a service contract. *See Call Henry II*, 855 F.3d at 1350.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

And finally, FAR 52.222-43, FAIR LABOR STANDARDS ACT AND SERVICE CONTRACT LABOR STANDARDS—PRICE ADJUSTMENT (MULTIPLE YEAR AND OPTION CONTRACTS) (MAY 1989), referred to in this decision as the FAR price adjustment clause, allows the government to adjust the contract price or contract unit price labor rates "to reflect the Contractor's actual increase or decrease in applicable wages and fringe benefits to the extent" the increase is to comply with DOL wage determinations, "[a]n increased or decreased wage determination otherwise applied to the contract by operation of law," or an applicable amendment to the fair labor standards. FAR 52.222-43(d). Because the clause allows for an adjustment to the contract price for these increases (or decreases), the contractor warrants the prices in the contract do not include allowances for any contingency to cover increased costs "for which [an] adjustment is provided under this clause." FAR 52.222-43(b).

Here we have a federal contract subject to the SCA, which was also a successor contract (FOF ¶¶ 1, 3). The minimum wages and fringe benefits, which included pension benefits, were set forth in the predecessor's CBA, which became the minimum wages and benefits applicable to the base year of BAE's contract via a DOL wage determination (*id.* ¶ 4). The Air Force included the DOL wage determination in the contract (*id.*). Further, pursuant to FAR 52.222-41(m), BAE notified the contracting officer that it would provide the wages and fringe benefits pursuant to CBAs effective at the beginning of the contract and each option year, as the options were considered new contracts for purposes of the SCA and required the insertion of a new or revised wage determination (*id.* ¶¶ 4, 11). The terms of those CBAs required the use of the union's pensions plans (*id.* ¶¶ 6-7).

As noted, when the contract ended, BAE and Aleut completely withdrew from the pension plans at issue in these appeals (FOF ¶¶ 14, 16-17). The pertinent statute, the MPPA, states that when there is a complete or partial withdrawal from a multiemployer plan, the employer is liable to the plan for the withdrawal liability amount, which is considered to be the allocable amount of unfunded vested benefits, as adjusted. 29 U.S.C. § 1381(a), (b).

BAE contends that the Air Force breached the contract when it failed to increase the contract price pursuant to the FAR price adjustment clause, FAR 52.222-43, for these pension withdrawal liability costs. According to BAE, these are increased costs of providing the mandatory wages and fringe benefits set forth in the CBAs here, which are part of the contract (and subcontract). BAE contends that because the price adjustment clause states the contract price may be adjusted to reflect the contractor's increase in wage determinations (e.g., fringe benefits) "otherwise applied to the contract by operation of law" this includes compliance costs, such as withdrawal liability costs, with the contractually required terms of the CBA. (App. br.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

at 10-11).  BAE cites to the Federal Circuit's *Lear Siegler Services, Inc. v. Rumsfeld*, 457 F.3d 1262 (Fed. Cir. 2006) for support because the court held the contractor, Lear, was entitled to an increase in the contract price pursuant to FAR 52.222-43 to compensate for the increased cost of providing a defined benefit health plan (*id.* at 11-12).

The Air Force argues that these appeals are akin to *Call Henry II*, and not *Lear*, and contends that withdrawal liability is not an increased cost to comply with a wage determination (gov't br. at 11-15).  The Air Force claims that BAE chose to provide the pension benefits pursuant to the pension plans set forth in the CBA, as the appellant in *Call Henry II* did, and therefore assumed the risk of withdrawal liability. According to the Air Force, it did not require BAE to execute the same IBT and FJCC CBAs and therefore BAE could have provided equal pension benefits pursuant to a single employer pension plan, not one governed by the MPAA, and therefore would not have incurred withdrawal liability charges.  (*Id.* at 15)

We start with a discussion of the two relevant cases cited by the parties.  In *Lear*, the contractor had a fixed-priced contract with the Air Force, subject to the SCA, which included the FAR price adjustment clause and the wages and benefits set forth in the predecessor's CBA.  *Lear*, 457 F.3d at 1265.  The CBA required Lear and its predecessor provide service employees with a defined-benefit health plan, a plan which provides an agreed-upon level of benefit regardless of cost ensuring the employees continue to receive the same health coverage even as costs rise.  *Id.*  During the contract, the costs increased during option year three and Lear requested a price adjustment pursuant to FAR 522.222-43, which the Air Force denied.  *Id.*  The Federal Circuit held that changes in an employer's cost of compliance with the terms of a wage determination, *i.e.*, the CBA, constituted an actual increase in fringe benefits per the FAR price adjustment clause.  *Id.* at 1268-69.

In *Call Henry II*, the Federal Circuit affirmed the Court of Federal Claims' dismissal of the contractor's claim for breach due to the government's failure to pay withdrawal liability costs.  As that appeal addressed the exact same issue as here, the facts are important.

Call Henry had a fixed-priced contract with a three-year base period of performance and up to seven one-year option periods which was subject to the SCA and incorporated by reference the FAR price adjustment clause.  *Call Henry II*, 855 F.3d at 1350.  Call Henry's three-year base period was a successor contract and by law, the applicable wage determination was set forth in the predecessor's CBA.  *Id.* at 1352.  That CBA, which included wage and fringe benefit provisions, was incorporated into Call Henry's contract.  *Call Henry, Inc. v. United States*, 125 Fed. Cl. 282-83 (2016) (referred to as *Call Henry I*).  The incorporated CBA required "the Employer," Call Henry, to pay contributions to the union pension fund an agreed upon

12

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

amount for all hours for which the employee received pay but not exceeding 40 hours per week. *Id.* at 284. In addition, the contractor was to make contributions to the pension fund each month for each eligible employee and contributions to the fund could not be distributed as wages. *Id.*

The Federal Circuit explained that instead of providing these wages and benefits through an alternative arrangement as the SCA permits, Call Henry negotiated a CBA with the same union and the first such agreement was effective from 2003-2007. *Call Henry II*, 855 F.3d at 1352. The court further explained that when the agency exercised the first option, the option contract became a successor contract to the three-year base contract and per the SCA, the 2003-2007 CBA provided the applicable wage determination. *Id.* As the agency continued to exercise the options, Call Henry continued to enter into CBAs which, by operation of law, provided the wage determination for the next option period. *Id.* at 1353. With each CBA, the pension contributions increased due to the pension plan's "critical status" nature as defined by the Pension Protection Act of 2006 (PPA). *Id.* With each increase, the agency provided a price adjustment pursuant to the FAR 52.222-41 price adjustment clause. *Id.* In 2012, the union party to the CBAs was decertified, which triggered a deemed withdrawal from that teamster's pension plan pursuant to the MPPAA. *Id.* Ultimately, Call Henry was liable for less than $2 million in withdrawal liability. *Id.*

The issue before the court, as here, was whether the agency breached the contract when it failed to reimburse Call Henry the pension withdrawal liability costs. *Call Henry II*, 855 F.3d at 1354. Per the court, one implication of the SCA "is that the U.S. government, as a customer, is willing to pay a premium for services in return for its contractor's obligation to compensate service employees adequately and fairly." *Id.* at 1351. As a result, the government will increase the contract price pursuant to the FAR price adjustment clause "when contractors incur increased costs as a result of complying with an increase in the wage determination applicable to their contract" which includes labor costs associated with an increase in the minimum wage rate, DOL prevailing wage rate, or the predecessor contractor's CBA. *Id.*

The court ruled that since the FAR price adjustment clause "conditions an upward price adjustment on increased costs made to comply with a 'wage determination otherwise applied to the contract'" Call Henry's contract "did not obligate Call Henry to pay MPPAA liability in the event of withdrawal." 855 F.3d at 1355-56. The court further stated:

> Instead, FAR 52.222-41(f) required Call Henry to provide
> its service employees with wages and fringe benefits equal
> or greater in value to those provided in the collective
> bargaining agreement applicable to the predecessor
> contract.

13

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

> When Call Henry independently chose to provide its
> employees with benefits by negotiating a collective
> bargaining agreement with the Teamsters and joining the
> Teamsters' multiemployer pension plan, Call Henry
> independently assumed the risk of MPPAA withdrawal
> liability.  Under these circumstances, where [the agency]
> did not require Call Henry to negotiate with the Teamsters
> or join the Teamsters' Pension Plan, and where [the
> agency] has no contractual recourse if Call Henry fails to
> satisfy its MPPAA withdrawal liability obligations, we do
> not read the SCA Price Adjustment Clause to allocate the
> risk of MPPAA liability to the government.

*Id.* at 1356.  The court distinguished *Lear* by explaining that Lear was contractually bound to the agency to make the necessary contributions to provide the employees with certain defined benefits, *i.e.*, a fixed benefit or set of benefits; when the cost of the benefits increased, "that constituted an increased wage determination applied by operation of law." *Id.* at 1355.

BAE contends that *Call Henry* is distinguishable because Call Henry negotiated its own CBA and there was nothing in the contract for the base period requiring Call Henry pay the wages and fringe benefits it negotiated under this new CBA (app. br. at 15; app. reply at 2-3).  BAE contends that in comparison, it was bound by all the terms and conditions of the 2005 CBA its predecessor negotiated and BAE and Aleut did not enter into new CBAs until 2009 (with FJCC) and 2010 (with the Alaska Teamsters) (app. br. at 16; app. reply at 3).  In sum, BAE argues the SSPARS contract required it provide the pension benefits enumerated in the predecessor CBAs and when it eventually negotiated new CBAs in 2009 and 2010, it could not have stopped providing the existing benefits and withdrawn from the pension plans due to the economic reality that the union and its benefits plans typically follow the workers from contractor to contractor (app. br. at 16; app. reply at 3).

The Air Force disputes this assertion and states the SSPARS contract only required BAE comply with FAR 52.222-41(f), the successor contractor rule, which obligates BAE provide wages and fringe benefits equal to or greater in value than those in the predecessor contractor's CBA.  The Air Force argues, again, that BAE "had at its disposal a range of options, including but not limited to, furnishing another equivalent fringe benefit such as a 401(k) in lieu of a pension, providing cash equivalent payment, and/or a combination of both." (Gov't br. at 19)

First, we note that BAE is factually incorrect when it states that Call Henry was not bound by the predecessor CBA as a wage determination.  BAE ignores the fact that

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Call Henry's contract was a successor contract subject to a CBA. *Call Henry II*, 855 F.3d at 1352. The Court of Federal Claims explained that the predecessor CBA included wage and fringe benefit provisions *and was incorporated into Call Henry's contract*. *Call Henry I*, 125 Fed. Cl. at 283. Specifically, the CBA stated that Call Henry would pay contributions to the union pension fund. *Id.* Those are the exact same facts as we have here (FOF ¶¶ 4, 6-7). In addition, contrary to BAE's assertions, regardless of whether the CBA was incorporated into the contract or not, Call Henry's contract nonetheless required it pay, as a minimum, the wages and fringe benefits of the predecessor contractors' CBA. FAR 22.1002-3(a); *see also* 29 C.F.R. § 4.163(b).

Second, as the Federal Circuit explained, each time the agency exercised an option period, Call Henry continued to enter into a new CBA which then provided the wage determination which applied by operation of law to the next option period. *Call Henry II*, 855 F.3d at 1353. The same is true here (*see* FOF ¶ 11). Each time an agency extends a contract period, such as by exercising an option, the extension is considered a new contract and requires the insertion of a new or revised wage determination. 29 C.F.R. §§ 4.143(b), 4.163(e). Therefore, BAE (like Call Henry) became its own successor when the contracting agency exercised the first option period in October 2007, and each time, BAE decided to continue with the same terms of the CBA and the union's pension plan (FOF ¶¶ 2, 10-11). The contract here, like the one in *Call Henry*, did not require the contractor negotiate with the union or join the union's pension plan as the SCA and implementing regulations only required BAE (like Call Henry) provide its service employees with wages and fringe benefits equal or greater in value to those provided in the CBA applicable to the predecessor contract. *See id.; Call Henry II*, 855 F.3d at 1356.

Accordingly, we see no distinction between the facts here and those in *Call Henry II*. In both matters, the issue was whether the government breached the contract. The contracts at issue, with the incorporated CBAs serving as wage determinations, set forth the minimum wages and fringe benefits the contractors had to pay its service employees. The minimum pension benefits set forth in the CBAs required contributions be computed in a certain manner; the wage determinations did not require the contractors use the union's pension plan or pay MPPAA withdrawal liability costs (rather, those were decisions made by Call Henry and BAE when they decided to use those plans). *Compare ARCTEC Servs.*, ASBCA Nos. 56444, *et al.*, 11-1 BCA ¶ 34,743 at 171,036 (holding that contractor was entitled to a price adjustment for severance costs because the wage determinations incorporating the CBAs required the payment of such costs upon expiration of the contract).

In its reply brief, BAE contends that the CBAs, specifically the IBT CBA, directly address withdrawal liability in multiemployer pension trusts and cites generally to the Rule 4 tab setting forth a partial document showing the requirements for BAE to participate in the Alaska Teamster-Employer Trust dated October 1, 2016

15

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

through September 30, 2019 (app. reply at 5 citing to R4, tab 65i). That document, which the index titled "Clear IBT CBA Sec. 6.02," was modified from the prior CBA and stated that: "The Union warrants and represents that the Company's liability (excluding withdrawal liability), with respect to providing retirement benefits, shall be no greater than provided above, including the Trust Agreement and applicable law" (FOF ¶ 12). BAE argues this language, incorporated into the contract, "expressly contemplated separate treatment for withdrawal liability, noting that [it] would be an additional cost for which the contractor is liable" (app. reply at 6). We disagree.

This language, which is open to interpretation and insufficiently addressed here, excludes withdrawal liability. It does not set forth withdrawal liability as part of a wage or fringe benefit, or wage determination. Further, while it is true that several contract modifications referenced extended or incorporated new CBAs, such as the one BAE quotes here for purposes of addressing increases in wages, we found these modifications did not specifically address pension plan withdrawal liability penalties (FOF ¶ 11). For all of these reasons, the language quoted by BAE is inadequate to create a contractual requirement on the part of the government for risk of additional costs associated with MPPAA withdrawal liability.

BAE also argues that withdrawal liability is a cost of a compliance with a wage determination because the CBAs required BAE and Aleut participate in three pension plans and these CBAs contemplated BAE and Aleut would inevitably owe withdrawal liability at the end of the contract (app. br. at 12-13; app. reply at 6). In *Call Henry II*, however, the court noted that even if it held MPPAA withdrawal liability "may, in some cases, be a cost of providing fringe benefits covered by the SCA" the breach of contract claim would fail because "*Call Henry's MPPAA withdrawal liability is not an increased cost of complying with a wage determination applied to Call Henry's NASA contract*" and therefore is not an increased cost of complying with a wage determination. *Call Henry II*, 855 F.3d at 1355 (emphasis added). The same is true here--the withdrawal liability is not an increased cost of complying with a *wage determination* applied to BAE's contract.

Next, BAE argues that withdrawal liability is a covered fringe benefit cost pursuant to regulation, which states that under federal service contracts "fringe benefits include. . . pensions on retirement or death" (app. br. at 13 quoting 29 C.F.R. § 4.162(a)). According to BAE, withdrawal liability is merely a cost, not a new fringe benefit but an increased cost of providing the pension benefits required by the CBAs (app. br. at 13-14). BAE does state that withdrawal liability "does not increase, decrease, or otherwise alter the pension benefit itself" but argues that since the government treats it as an allowable cost under a cost-type contract, it should be treated the same with fixed-priced contracts (*id.* at 14).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

The Air Force notes that BAE cites no legal authority to support this argument. The Air Force again relies on *Call Henry II* to support its contentions that withdrawal liability is not a wage determination otherwise applied to the contract because the SSPARS contract did not require BAE to pay the fee or even join those pension funds (gov't br. at 17-18). We agree with the Air Force. Essentially, BAE is rephrasing the argument that the Federal Circuit rejected in *Call Henry II*.

Making another argument effectively precluded by the Federal Circuit's reasoning in *Call Henry II*, BAE contends that the Air Force admitted entitlement when it reimbursed the pension surcharges (app. br. at 16). According to BAE, the MPPAA withdrawal liability and PPA surcharges serve the same purpose--to ensure the pension funds remain solvent and therefore it makes no sense to treat the two disparately (*id.* at 17). The Air Force argues that the surcharge is a bona fide fringe benefit and an increased cost of complying with a wage determination, citing 29 C.F.R. § 4.171 (gov't br. at 21-22). BAE ignores the fact the court in *Call Henry II* explained that each time the mandatory pension contributions increased, they served as the wage determination and the agency provided a price adjustment pursuant to the FAR price adjustment clause. *Call Henry II*, 855 F.3d at 1353. In other words, there is a difference between pension contributions which were part of the wage determination in the contract and withdrawal liabilities which were not part of the contract. *See also M1 Support Services, LP v. Administrator*, ARB No. 2022-0022, -0023, -0067, 2024 WL 1091869 (Feb. 23, 2024) (holding supplemental contributions to rehabilitate a distressed pension plan pursuant to the PPA must be included in wage determinations under the SCA and stating *Call Henry II* did not address that issue and resolved the dispute based on an absence of contract language).

At the end of the day, while we recognize the economic and other realities of successor contract CBAs, we are bound by the basic tenet that for an appellant to prevail on a breach of contract claim, there must be an actual breach. Here, the FAR price adjustment clause allows the government to adjust the contract price when the contractor must comply with "[a]n increased or decreased wage determination otherwise applied to the contract by operation of law," *i.e.*, the CBA. FAR 52.222-43(d)(2). The wage determinations applied to the SSPARS contract did not require BAE use the union's pension plan or pay MPPAA withdrawal liability and therefore the Air Force did not breach the contract when it failed to pay these costs. *See Call Henry II*, 855 F.3d at 1356.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

b. *Did the Air Force breach the contract when it failed to pay withdrawal liability costs pursuant to FAR 52.237-3(d)?*

BAE also argues that the FAR's continuity of services clause requires reimbursement of the withdrawal liability costs (app. br. at 18). That FAR clause states:

> (d) The Contractor shall be reimbursed for all reasonable phase-in, phase-out costs (*i.e.*, costs incurred within the agreed period after contract expiration that result from phase-in, phase-out operations) and a fee (profit) not to exceed a pro rata portion of the fee (profit) under this contract.

FAR 52.237-3, CONTINUITY OF SERVICES (JAN 1991). BAE contends that CLIN 1140 of the contract (the phase-out CLIN) defines phase-out costs as including labor, and other items or services necessary to transition contract responsibilities (app. br. at 18 quoting R4, tab 2). According to BAE, labor includes labor costs and fringe benefits, such as withdrawal liability costs because but for the phase out, there would be no withdrawal from the pensions (*id.* at 18-19). The Air Force contends it never issued BAE the required written notice that phase-in, phase-out services were required and therefore never invoked the clause (gov't br. at 23). BAE did not specifically respond to the Air Force's argument in its reply brief.

While the record contains a bilateral modification issued on June 27, 2018, showing the government increased the contract price for phase-out costs from June 1, 2018 through August 31, 2018, there is nothing in the record showing the government extended services after expiration of the contract for phase-out services (*See* FOF ¶¶ 2, 15). In fact, BAE's phase-out proposal stated it assumed the government would exercise FAR 52.217-8, not FAR 52.237-3 (FOF ¶ 14). As the government notes, the relevant paragraph quoted above and cited by BAE states the contractor is to be reimbursed for "costs incurred within the agreed period *after contract expiration* that result from phase-in, phase-out operations." FAR 52.237-3(d) (emphasis added). As there is nothing in the record showing BAE performed work on the contract after expiration, and both parties agreed the contract ended on August 31, 2018, this paragraph of the clause cannot provide BAE the requested relief.

c. *Did the Air Force breach the contract when it failed to treat withdrawal liability costs as an unquantifiable contingency pursuant to FAR 31.205-7?*

BAE also argues that withdrawal liability costs are reimbursable as a payment to cover unquantifiable contingencies. Specifically, BAE contends that since

18

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

FAR 52.222-43(b), the price adjustment clause, precludes a contractor from including allowances for any contingency for increased costs, and FAR 31.205-7 explains that contingencies are costs which cannot be measured precisely, the contractor can only seek reimbursement once the obligation arises. In this case, the contingency with the unknown cost was the withdrawal liability. (App. br. at 19-20). BAE also argues that withdrawal liability is akin to abnormal or mass severance requirements set forth in FAR 31.205-6(g)(5) which recognizes the government's obligation to participate to the extent of its fair share in payment (*id.* at 20). In response, the Air Force contends there is no legal authority supporting BAE's argument and, in the alternative, these costs would nevertheless be unallowable (gov't br. at 24).

BAE cannot show the Air Force breached the contract here. BAE is attempting to argue, with a slight twist, that the Air Force should have increased the contract price pursuant to the FAR price adjustment clause because the withdrawal liability is an unknown contingency. However, as discussed in detail above, pursuant to the court's holding in *Call Henry II*, this argument fails as the contract did not specifically provide for reimbursement of this cost.

> d. *Did the Air Force breach the contract when it failed to pay withdrawal liability costs pursuant to FAR 52.215-15 as a segment closing cost?*

Finally, BAE contends that Aleut's withdrawal from the CBAs at the end of its subcontract was akin to a segment closing and is recoverable pursuant to FAR 52.215-15, PENSION ADJUSTMENTS AND ASSET REVERSIONS (OCT 2004) (app. br. at 20-21). BAE cites to the following paragraph of that clause:

> (b) For segment closings, pension plan terminations, or curtailment of benefits, the adjustment amount shall be the amount measured, assigned, and allocated in accordance with 48 CFR 9904.413-50(c)(12) for contracts and subcontracts that are subject to Cost Accounting Standards (CAS) Board rules and regulations (48 CFR Chapter 99). .
> . .

FAR 52.215-5(b). This clause is used in contracts when it is anticipated that certified cost or pricing data will be required. FAR 15.408(g). According to BAE, Aleut submitted certified cost and pricing data (app. br. at 4, 21).

There are likely numerous reasons why this clause does not apply here but we will address just one. The Cost Accounting Standards (CAS) set forth definitions for both segment and segment closing. A segment is "one of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

product or service" and includes joint ventures and subsidiaries. 48 C.F.R. § 9904.413-30(a)(19). A segment closing means a segment has been sold or ownership has been transferred, operations have been discontinued or the segment has discontinued doing or actively seeking government business under contracts subject to this standard. *Id.* § 9904.413-30(a)(20).

BAE concedes that there was no actual segment closing here (app. reply at 8-9). According to BAE, however, had it and Aleut self-funded the pensions and then terminated them when there was a deficit, both would be entitled to recover that deficit (app. reply at 9). But BAE and Aleut did not self-fund the pensions, as they could have, and therefore that issue is not before us. In other words, we cannot apply (and therefore extend) a FAR and CAS rule regarding segment closings to a situation where appellant admits there was no segment closing.

CONCLUSION

For the foregoing reasons, we deny appellant's appeals.

Dated: July 29, 2024

LAURA EYESTER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

20

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 63218, 63219, Appeals of BAE Systems Technology Solutions & Services Inc., rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals